141521 and 141522 in re Nexium Antitrust litigation. Good morning. Good morning and thank you Judge Toroway. Canon Shan Gam of Williams and Connolly appearing on behalf of appellants and with the court's leave I'd like to reserve four minutes for rebuttal. May it please the court. Class actions are an exception to the ordinary rule that litigation is conducted between named parties. In order to ensure that the class action mechanism is preserved for cases where it is appropriate, Rule 23b3 requires plaintiffs seeking class certification to show that common issues predominate over individualized ones. Because the fact of injury is a central element of an antitrust claim, Plaintiffs seeking class certification in an antitrust case must show that they will be able to prove class-wide injury at trial using common evidence. It naturally follows from that that where it is clear at the class certification stage that the proposed class includes members who did not suffer any injury, the fact of injury cannot be treated as a common question and the predominance requirement is therefore not satisfied. Is your view that any class member who is not injured defeats the class? In the light of Halliburton, that would seem to be difficult. Well, that is our view and I will deal with Halliburton, but let me explain first why that's our view, second why that should not unduly concern this court, and third why Halliburton is distinguishable. First of all, the reason why we think that the presence of a conceitedly uninjured class member defeats class certification is precisely because it shows that the fact of injury will not be able to be proved at trial using common evidence, and that's for the simple reason that it demonstrates that the issue of fact of injury cannot be resolved, in the Supreme Court's words, in one stroke. But what if the nature of the case is such that consistent with your Seventh Amendment rights and the civil rules, you could at trial pick off that one person in this hypothetical, then why couldn't you have a class action in that situation? Judge Kayada, I think it's important to underscore at the outset that this is not a case in which plaintiff's expert has come forward and said, at trial I will be able to distinguish between those class members who have allegedly been injured and those who have not. Plaintiff's expert has repeatedly conceded, and did so in her deposition, that her model affords no mechanism for doing that, so I just want to make that clear. Now, the reason why we think that, as a practical matter, it is still insufficient for a plaintiff to say, at trial, our model will be able to draw that distinction, and therefore the case should go forward on a class-wide basis, is precisely because the Supreme Court has directed us to determine whether or not the element in question can be satisfied as to all of the class members, and that's really... Suppose right now they had a plan, and Judge Young had gone forward and not stopped where he did, suppose he'd gone forward and found that there is a mechanism consistent with your Seventh Amendment rights, the Rules Enabling Act and the Rules of Civil Procedure, where it would be possible to identify the members who had no injury. Then we could have a class certified now, as long as we had a plan in place to do that, couldn't we? Well, again, I think that would be a more difficult case than this one, precisely because plaintiff's expert offered no promise of there being such a mechanism, and indeed plaintiffs have not suggested that at any point of this litigation there would be a mechanism for making this determination. And let me just pause on that point for a minute and sort of underscore why that is true here. To take one of the many examples of categories of uninjured class members that we've identified here, take the brand loyalist consumers. With regard to brand loyalist consumers, there is obviously no way of using a model to determine who those brand loyalist consumers actually are, and plaintiff's expert admitted as much in her deposition at page 384 of the joint appendix. She admitted that it would be impossible to identify those people who are going to be brand loyal and those who are not. So again, this is not just a problem at the class certification stage of this case. This would be a problem with the case going forward as well. And so this isn't the sort of hypothetical case where, again, the plaintiffs say, we can't do it now, but we have a model that might allow us to do it at trial. Now let me come back to Judge Dyke's question, if I may, and explain why I really don't think that this issue of the one hypothetical uninjured class member is a big problem in practice. As a practical matter, the smaller the number of uninjured class members, the easier it will be to narrow the class definition in order to avoid the problem of having a class that includes uninjured class members. And I would submit that I think it's really for that reason that in the courts that have adopted the rule that we're advancing, and of course we think that this court adopted that rule in the new motor vehicles case, we haven't seen a flood of cases in which class certification is being defeated on the basis of one or two or some small number of uninjured class members. So again, as a practical matter, I think this is really not a potentially significant problem. And of course, all the court need do in this case in order to reverse is to conclude that whereas here, the district court has found that there are more than a de minimis number of uninjured class members, that under those circumstances, class certification is inappropriate. Well, I wonder, looking at the facts of this case, as to whether that's really true. I mean, you agree that a class member wouldn't have to suffer injury during the entire period, right? It would be sufficient to suffer injury during part of the period. Yes, that is correct. All right. So if I could just briefly go through the six categories with you. I have some concern as to whether the amount of uninjured class members isn't quite a bit overstated, both in the district court decision and in your argument. I mean, let's take the rebate people. As I understand it, the evidence shows that the rebates would continue for the first year. So why wouldn't those people be injured at least for the first year? This is the TPP class members. Right. So with regard to the sort of numbers, let me sort of approach this globally, and then I'm happy to kind of break this down on a sort of category by category basis. So as to the number of uninjured class members more generally, we believe that the district court essentially estimated the number of uninjured consumers at about 7 to 8 to 9.8%. Well, I understand, but what I'm trying to do is to go through those six categories that were treated and to see whether we're really talking about a significant number of uninjured class members, since you concede that the class members injured for part of the period would qualify. As I've gone through the six categories, it seems to me there are not that many people who are uninjured for at least some of the class period. Yes. Let me start with the category that you've identified. I'm happy to talk about all of the others, but, of course, we have a district court finding here, so the real question is whether that finding is clearly erroneous. With regard to the third-party payers and with regard to rebates, the evidence that we have in the record indicates that there were $12.9 billion of rebates over just part of the class period alone. Yes, but the problem is you're treating this as an aggregate problem, and it would seem to me that with respect to the TPPs that if there's some transactions where there's injury, where there's loss, where there's damage, the fact that those transactions are offset by other transactions potentially which would cut the other way and that the net effect with respect to the TPPs would be no injury is not the right analysis. Don't you have to say that if there's some transactions where the TPP is injured, that the fact that they're offsetting transactions the other way is irrelevant to the question of injury? But just to be clear, Judge Dyck, we're not the ones who are seeking to treat this on an aggregate basis. After all, it's Dr. Rosenthal. I understand, but isn't the answer that it's sufficient that some of the transactions result in injury? It doesn't have to be that the net effect of the aggregate is sufficient. Yes, but in some sense, Judge Dyck, I think that this colloquy really underscores precisely why the analysis is individualized, and that is simply because not only do we have Dr. Hughes' unrebutted testimony about the amount of the rebates, $12.9 billion over part of the class period. That was about 40 to 50 percent of the overall price of the drug, and Dr. Rosenthal conceded that those were much more substantial rebates than for other drugs. What we also have is Dr. Hughes' testimony. The problem I'm having is you want to talk about broad principles, and I want to talk about the individual categories that the district court said led to a finding that some class members were uninjured because it seems to me that when you do that, for example, with respect to the consumer brand loyalists, you find that in the first three quarters of the generic entry that the price of the brand goes down, so those people are injured during the first three quarters. After that, they may pay a higher price, but during the first three quarters, they're injured. So it seems to me what I'm saying is there needs to be a very precise analysis of these individual classes based on the record that was made here and that it isn't sufficient just to say, well, there's some findings here. The findings in some respect may be mistaken, may overstate the problem. Well, first of all, Judge Dyke, to kind of step back, it is, of course, our view that the number of uninjured class members doesn't matter as a legal matter, and for that proposition, we rely on the Supreme Court's decision in Walmart and on this Court's decision in New Motor Vehicles, which says that plaintiff's theory must include some means of determining that each member of the class was, in fact, injured. Now, I do think there are responses on each of these categories, and we set some of them out in our brief with regard to the brand loyalists. I would note that while plaintiffs suggest somewhat misleadingly that the price would, in fact, initially dip for the brand version of the drug after a generic entry, in fact, the evidence in the record from Dr. Rosenthal suggests that the prices then would go up substantially, and that's what Appendix H says. But you've agreed that if they're injured for three quarters of a year, they're probably a member of the class, right? It doesn't make any difference that later on the entry of the generic cuts the other way and they have to pay more. Right, but I think that this discussion illustrates why you have to have an individualized inquiry, and I would actually go back on this point to the third-party payers, because not only did Dr. Hughes offer evidence of the size of the rebates, he offered testimony that those rebates vary substantially from payer to payer. And I think with particular regard to the third-party payers and with regard to, you know, rebates, co-pay structures, and fixed-price contracts, I think it's important to underscore that for any third-party payer, you can actually have multiple of these factors in play in any particular case. And I think to sort of come back to the broader legal principle, and I don't mean to unduly move off the facts, but I think it's important to kind of keep in mind what legal principle we're applying here. Again, I think that this parade of horribles, that the rule that we're advancing, a rule that this circuit has adopted and numerous other circuits have adopted, is somehow going to lead to the end of the class action more generally, is just simply misguided. And I think in particular, it's no accident that many of these cases, new motor vehicles included, are these cases involving these indirect purchaser classes. As this court said in new motor vehicles, cases of this variety are far from the paradigmatic antitrust case, where you have a claim of price fixing that affects direct purchasers, a case in which it is easier to show injury because you have a very direct relationship, right? You have a market price and you have an agreement to fix the price at a super competitive price. If you take a look at one document in the joint appendix, I would direct this court to page 325 of the joint appendix, which is a chart that illustrates how the contractual relationships operate with regard to these sorts of- Before you run out of time, come back to the individual consumer brand loyalist in the first three quarters point. This is a large category and you rely on it as showing that there's a significant number of uninjured people. Is it not true that the brand loyalists during the first three quarters of the generic entry in fact are injured? Well, it may be true as to brand loyalists that they would pay a lower price initially for some short period of time. That price again would then go up. We don't have evidence- Okay, so why does that make them appropriate class members since for part of the period they're suffering injury? Yeah, but my point is simply that even if you take that category out of the equation, and again I think it's important to realize that when you look at Judge Young's finding, it was a cumulative finding. His finding was that as to third party payers and consumers who through rebates, contracts, and brand loyal purchasing suffered no damages, there were more than a de minimis number of those entities and individuals. Now again, I just want to drive home the fact that we do not think that whether or not this number is de minimis is of legal significance. And conversely, I would just point out that plaintiffs don't seem to offer an alternative standard here. Plaintiffs don't seem to identify at what point you would have enough uninjured class members to defeat predominance. The standard that we are advancing today is the standard that the Supreme Court itself adopted in Walmart after this court's decision in New Motor Vehicles. And notwithstanding plaintiffs' efforts to characterize what this court said in New Motor Vehicles as dicta, this court in New Motor Vehicles was clearly setting out its view as to how the predominance inquiry should work with regard to the very same element, fact of injury, in an antitrust class action. And in light of the district court's finding, we think that that legal principle disposes of this case. And I would reserve the balance of my time. Let me just stay with Judge Dice's question. If we knew for how long a particular consumer purchased the product, and whether and when their copay terms were, then we might be able to determine that that 5.8 percent estimate is too high, might we not? I mean, I think that you could try to determine that, because we would certainly concede that that 5.8 percent number involved transactions. It did not involve consumers. So as Judge Dice is saying, there could be a consumer whose one transaction is included in the 5.8 percent, but another transaction is not. And if there were more factual investigation done and more information about the consumers, you might ultimately have to concede that one of those consumers was injured, even though they're in the 5.8 percent, and one is not. I suppose that the actual number could be different, Judge Chiata, but I think my point is that particularly when you take a look at third-party payers and the sheer volume of the rebates, and again that's even leaving aside the conceptual point about the contractual arrangements, I think that you're talking about a substantial number of class members, and certainly nowhere near. You've got the same problem there that you have with the individual consumer brand loyalists, and that is that the record shows that the rebates would continue in the first year of generic entry. So I'm having difficulty in understanding why during that first year these third-party payers aren't injured. It may be that later on they are not injured. It may be that later on, in fact, they're benefited by the generic entry, but the fact is that the record shows that during that first year they are suffering injury, and that would seem sufficient to bring them within the class. But even if that is true, Judge Dyke, as we point out in our brief, the way in which these rebates actually operate with regard to third-party payers is that they operate through this series of contracts, and they are set out again at page 325 of the Joint Appendix. So it isn't as if the rebates necessarily flow directly to the third-party payers. In the main, the rebates are paid to pharmacy benefit managers who are in contractual arrangements with the third-party payers, and that simply underscores the fact that to make this – Well, that again is a problem for you, because what you're assuming is that these third-party payers, that all of their customers or whatever you want to call them, members, consumers, are buying from that same pharmacy that receives the rebates. There's no reason to believe that's true. I don't. So far as I know, the record doesn't suggest that the TPP requires purchases from a rebate-receiving pharmacy, and so that suggests that some of the consumers who deal with these TPPs are going to other pharmacies that aren't offering rebates. With the consequence that as to some of the transactions, there is injury with respect to the third-party payer. But again, the record does reflect, I think, that as to at least some of the third-party payers, they are in contractual arrangements with the pharmacy benefit managers, whereby the price of the brand product is actually fixed. And again, this underscores the fact that in order to determine whether any third-party payer is injured, you really would have to have an individualized inquiry. There is no model by which you can determine which of these third-party payers are injured and which aren't, and it bears underscoring that the plaintiffs are the ones who bear the burden on any relevant factual question. Again, our legal argument here is that the specific number doesn't matter, and that's for the simple reason. Isn't it counterintuitive that if there's a generic entry, that the TPPs would structure their co-pays and their arrangements in such a way that they're worse off on an overall basis, that it's costing them money when there's a generic entry? Isn't that kind of counterintuitive? Well, but I think in many ways the pharmacy benefit managers are the ones who, you know, this is an arm's-length contractual arrangement. The pharmacy benefit managers are often the ones who are dealing directly or at least more directly with the pharmaceutical companies. My point is simply that, again, this – We're talking about the pharmacy benefit manufacturers are not in the class. It's the TPPs. Why would a union health plan structure its co-pays and arrangements with pharmacies in such a way that, as a result of the entry of a generic, they're suffering – they create a situation where they're suffering an adverse impact? It's just totally counterintuitive. And, you know, I'm not aware of any theory as to why a rational TPP would do that. Well, but, again, I think it's because the pharmacy benefit manufacturers are the ones who are dealing more directly with the pharmaceutical companies, the ones who produce the actual products. And the evidence in the record illustrates that, in fact, the majority, the significant majority of the rebates flow to the pharmacy benefit managers, and in some circumstances those rebates flow down to the third-party payers and in some circumstances they don't. All of this simply illustrates that an individualized inquiry would be required in order to determine whether any third-party payer, in fact, suffered an injury. And, again, plaintiffs bear the ultimate burden here, but our overarching legal argument – and, again, we think this is a legal argument that this Court really embraced in the new motor vehicles case – is that it is the very existence of an uninjured class member that shows that the fact of injury no longer will be able to be shown on an all-or-nothing basis. That is simply our principled submission underlying – I think you undoubtedly win if a single uninjured class member defeats the class. But the problem is, it seems to me, that it's very speculative to say that there's any significant number of uninjured class members and that you have to prevail on that legal principle of one or a few class members defeats the class in order for you to prevail. So I would certainly concede, Judge Dyke, that Judge Young did not offer a specific number. And I think that the reason that there is no need for a specific number is precisely because the legal principle here is not a legal principle that requires a specific number to be found. An issue is either a common issue or it is an individualized one. The fact of injury cannot be a 95% common issue for purposes of predominance. It either is or it isn't. And the Supreme Court has taught us that for purposes of determining whether an issue is a common issue, you look to whether the plaintiffs will be able to prove that issue on a class-wide basis. As Plaintiff's Own Amicus A.I. says at page 6 of their brief, an issue is common whether class members win or lose as long as they do so together. And whereas here it has been determined that there are uninjured class members, however many there may be, it simply cannot be the case that the plaintiffs will win or lose together. They may lose together at trial, but they will not win together precisely because those uninjured class members are not entitled to relief. I'll reserve the balance of my time.  Mr. Wechsler, good morning. Good morning. Ken Wechsler on behalf of the NPAERS. I want to address one thing right off the bat, which has to do with what our burden is at trial. What the evidence reflects in this case is a 98.2% switch rate in transactions. Very soon after generic competition comes onto the market, people that are engaged in the transactions of purchasing branded name Nexium switch to the generic. I would have no problem going to court, going to trial, and asking a jury to decide that it is more likely than not that all class members at some point in the class period purchased a generic and that all class members were injured. What about a class member, a consumer, who's got a copay? A flat copay? Yes, they have a copay. They buy Nexium for six months, and during that entire period of time, they have a copay that's fixed that's less than the but-for cost of either Nexium or the generic. How would that person have been injured? Well, if after the six months, the copay situation changed and they paid more. Sure, but that wasn't my hypothetical. Okay, if you're hypothetical, could there be an uninjured class member out there? And I think this is a legitimate question. What is the effect of that? I mean, why are we concerned about the existence of uninjured class members? But my question is, don't we know? If all I need to know about someone is that they have a fixed copay during the period they were buying Nexium that is less than the but-for price of either Nexium or a generic drug, then I know it's impossible for that person to have been injured. Well, flat copayers are excluded from the class definition. And how are you going to determine who's a flat copayer? Well, certainly in the allocation stage, if somebody makes a claim, I mean, we've been doing these cases for 20 years. We're very adept at this point at being able to determine what third-party payers' actual spend are and what consumers' actual spend are. And when they submit their records, which are kept by pharmacies and pharmacy benefit managers, we'll be able to determine whether or not they suffered any damage. Nobody's going to collect one dime. In fact, that's one of the interesting things here. There is nothing that the defendants are complaining about that results in them spending one dime more than they would have to. So when they rely on the rail freight case as precedent for not permitting uninjured class members to be in the class, that case the plaintiff's expert actually ascribed damages to entities that were not in the class. And so the defendant was faced with paying more in the event of a verdict than it would have to. Let's stick with the facts of this case. Yeah. Let me try a different hypothetical on you where there are different co-pays for the generic and the brand. And as a result of the brand entry, the co-pay to the brand loyalists increases, which is a fairly common situation to encourage switching to the generic, right? Correct. How are those people injured, the brand loyalists, who find themselves as a result of the generic entry having to pay more? It would seem to me they are injured rather than benefiting from the generic entry. They're not entitled to net damages at that point. You're correct. Right.  They're not injured at that point. All right. So we've got some people in this class, as it's been defined, who are not injured. And the question is, you know, if they're a small number, is that going to defeat the class, the issue that we were talking about? Right. And I don't think new motor vehicles withstands the weight of that assertion, in part. In light of Halliburton? In light of Halliburton and in light of new motor vehicles itself. I mean, the factual differences here are enormous. In new motor vehicles, you had a novel and complex theory, which we do not have here. These cases have been litigated for umpteen years. You had an expert report that was based on intuition and not hard data. You had an incomplete record below. And here we have common evidence that Judge Young looked at and that our expert used. And that common evidence consisted of actual national retail data showing the exact prices of Nexium during the class period, actual national retail data showing the price of the various yardsticks that were examined for possible use in terms of the methodology, and actual national retail data reflecting the actual yardstick used. On top of it, defendants' own documents, which I refer the Court to page 224 of the record, paragraph 24. Defendants' own documents utilized the same national retail data and reached the same result as Professor Rosenthal. Take the category of people that Judge Dyke just asked you about. If any of them walked into this courtroom and sued Nexium, they would lose. They would not have injury. They would not even get to the damages phase of the case. That's correct. And so by being in a class, if the class Judge Young has certified, those precise people will, in fact, if you prevail, recover from the defendants. No, they won't. Because if you, and this is very important, I think, in terms of reading Judge Young's opinion and Professor Rosenthal's opinion. Zero damages are assigned to people who aren't entitled to any. And so it would become the allocation process would be where we would make the determination of who is entitled to damages and who is not. But on the aggregate basis, nobody is collecting more than they should. Where is it in the model? I did not, Judge Young doesn't point to anything in your expert's model that would allow that type of individual differentiation to identify. Because if you can, certainly if you could pick off all of those people at trial and there was a mechanism for doing that, then don't you have a much stronger case? Well, but then we're looking at, we're not having a class action. We're having individual trials. And the defendants know that if we decertify this class, we're not going to have individual trials. We're going to have very few trials. How does your expert's model identify that? The expert's model identifies 5.8% of the transactions as having no overcharge. And because those transactions have no overcharge, no damages are ascribed to those transactions. Two to 4% of the transactions involve the use of coupons. Now, we briefed the fact that. Well, before you go on to the coupons, let's stick with this particular problem, these uninjured class members. In the course of class actions, notices go out to the individual class members and often there are questions. Say in a securities class action, you say, did you buy during this period of time? If you did, you're a class member. But then you have to provide further information. Did you sell the security at a loss or a profit? And if you sold at a profit, you don't recover the damages. Right. Is there a mechanism in connection with the class process that would enable you to say that these individuals whom we've identified as not being injured aren't going to get any recovery? Certainly, Your Honor. That's a great question. And that's simply by asking, does your plan have a flat copay? What was the copay for the generic during X period versus what was the copay for the brand and which did you buy? I mean, you have to make those individual determinations in an allocation phase and we've done it. Claims administrators, in these cases, this Court has affirmed much more complicated cases than this one involving these same third-party payers and the same subset or group of consumers. I mean, AWP involved more than 200 drugs. McKesson involved more than 400 drugs. And we had a claims process where we were able to determine who was entitled to what based upon their various circumstances. And it's been done repeatedly. And believe me, we have perfected it over the years. Judge Young started it with Relafin and Judge Saris improved upon it in AWP where we are actually able to subpoena the specific information from PBMs and chain pharmacies with respect to individuals. We did it in AWP with respect to CMS. Identify those people, identify their spends, actually connect with those people, determine what they are entitled to, and if appropriate, send them checks and actually get money to them. We have, you know, really worked and perfected this process. So what you're saying is that as part of that process, these people would be identified. Yes, they would. And they wouldn't share in the class recovery. But in terms of it. They wouldn't share in the class recovery, right? Correct. They would not share in the class recovery. And that's my point here. Show us where we can find that in the record because the thing that most concerned me about is he certifies a class without saying how if there's no settlement, he has to assume there's going to be no settlement, how at trial the people who are uninjured will be identified and sifted out in a way that is manageable. And you're describing to us some claim administration process that works. But we don't have a trial plan approved by Judge Young that we can judge whether it will do it or not. I understand your point. And yet he did leave open, in his opinion, the fact that he's going to revisit the issue of damages and how he's going to deal with that further down the line. But not just damages. Whether someone's been injured at all. How is he going to, if you don't have a settlement, okay, so you don't have all the ease that comes with a settlement class, but you actually have a litigation class, how does he, knowing that there are uninjured people in the class, certify a class without spelling out how the people can be pulled out or picked off in a way that is manageable under Rule 23? Look, can I back up? I understand your question. I do want to answer it. But I think that there's a certain amount of confusion between, you know, impact or injury and damages. Because I think we've briefed it very heavily. And I haven't heard any discussion of it. And that could be our fault in our briefing. But the injury is incurred at the time of the purchase. The purchase price contains the overcharge. I mean, Hanover Shoe, all the cases going back to Chattanooga Pipe. Let me see if I can clarify this a little bit. I understand the expert testimony that you put in. You presented a model for calculating damage across the entire class. And the uninjured people are excluded from that damages model. In other words, there's no calculation of money going to them. Right. And if what I understand you to be saying is that the damages are calculated on an aggregate basis, rather than an individualized basis in the course of this, and then in terms of the allocation of the recovery later on, the people who are uninjured parties will be identified and they won't share in that aggregate recovery. That's exactly correct. So the aggregate recovery doesn't include damages for the uninjured people. And the individual uninjured people later don't share in the aggregate recovery. That's exactly correct. And I think, quite honestly, we took things off the table, like rebates, and that we're not exactly 100% certain that they should have been taken off the table. But in light of Comcast and having to measure your damages have to be connected to the harm, we anticipated an argument from the defendants that the rebates were connected with the harm. Where can we look in the record to see that when it comes time to allocating the aggregate recovery, anyone, you will have a mechanism for identifying all those class members who were not injured so that none of them will share in the recovery. There's nothing in the order that does that. Where do we look specifically? I cannot point you to anything. So this is just something that's in your head that you hope to do down the road, but it hasn't been spelled out to Judge Young or to us. Well, it has been spelled out in cases that have been affirmed by this court a number of times. No, no, no. In this case, how are you going to identify these uninjured people that you just told Judge Dyke would not get any money? We have not presented a plan of allocation yet to Judge Young. That is for down the line. What we set out to do was to follow the requirements of Halliburton and Walmart and Comcast that we demonstrate. But you have a class where you admit that there's a debate as to how many, but you admit there are uninjured persons in that class, therefore the type of persons who if they came and sued AstraZeneca, they would lose on lack of injury. No, we do not admit that. We do not admit that. I mean, your question did not ask me to concede that, and we do not admit that. Well, Judge Young found it. He did not, and we disagree with that very seriously. You want us to read his statement that the class clearly has uninjured people as saying simply that it has people who on a net damage basis. Yes, I think that's a fair reading of what he said. I thought a few minutes ago you admitted that there were uninjured class members here. I gave you the hypothetical about the brand loyalists whose co-pay increases as a result of the generic entry, and you agreed that they're within the class and that they're not injured. So it does seem to me that we're dealing with a situation in which we have to deal, at least with some small number of people, maybe declining over the course of the period, who are uninjured. You're right, Your Honor, and I did follow your hypothetical, and in following the hypothetical, I believe very strongly that if there is an uninjured class member, we still met our burden under Rule 23 and predominance. But what I do want to point out. I'm lost now. Are you or are you not admitting that the class as defined by Judge Young does include some of the people that Judge Dyke just described? No, I would like to, if I could direct your, no. And what excludes them? I'm looking at the class definition. What excludes them? It's on page 40 of the district court order. At page 31 and 38, he says that Professor Rosenthal's methodology is reliable. And I'm sorry, that's at 18A. And he says, it persuasively demonstrates that the end payers have suffered class-wide antitrust impact under a single theory of liability and has shown through her yardstick measurement of overcharges that all class members were impacted and continue to be impacted by generic foreclosure. That's at 31A and 32A. I don't think that's the question that Judge Dyke and I are asking. If you agree that the people that Judge Dyke just described are in the class, and I understand you to have agreed that those people would never have paid a penny more in the but-for world than in the actual world, then where is it in the order, in the class definition, that those people are carved out definitionally, categorically? Well, agreeing with Judge Dyke's hypothetical and following it through, you know, the defendants cannot benefit by the wrongdoing that maintains generic foreclosure. It's the RKO Pictures case. I mean, they've created a world where we don't know who fits in within these hypotheticals because there's no generic competition on the market, and they don't get the benefit of that. What we do know is, using the yardstick method, there's a 98.2% switching chance. And so it is more likely than not, under a preponderance standard, which is what we have at trial, that every class member at least had one transaction where they were impacted. Well, how could that be, given what Judge Dyke just asked you about? Those class members that he just defined could not have been injured, if I'm understanding the record here. Someone who just bought it for a week. Well, it happens to be a long-term maintenance drug, so that's not likely. I mean, there's a possibility, and frankly, Judge Young pointed out, this was the problem with the defense expert. He pointed out lots of different possibilities without reliably quantifying anything. And in fact, Judge Young said he was unable to identify one third-party payer who was uninjured. And so, you know, being intellectually honest and using the yardstick method, yes, there are a certain number of transactions that don't involve an overcharge. But for the class period with a 98.2 percent switch rate, I don't know how, you know, at trial we couldn't meet our burden of proof. Or at the class certification stage, where Comcast says it's an amgen, it's not our burden to prove everybody was injured at this stage. It's our burden to show that there is a method of proving it using common evidence, which we've done. What you're saying is if you had a case where 51 percent of the class members were likely harmed, but you don't know who they were, you could carry your burden of proof of showing everyone was harmed more likely than not. I don't think I would like to go to trial with that case, Your Honor. Well, then you just up it to 98 percent. It's the same methodology. You're saying because when we look at the group as an average, we know most of them, 98 percent, are injured. Therefore, a jury could find they're all injured. That's what I hear you saying. A jury could. I think with the facts here, they're very strong. And what mechanism will there be at trial to identify the type of people that Judge Dyke just talked about? Well, the trial would allow us to put on the class-wide evidence, the common evidence that I've described, and the jury would be charged with a preponderance of the evidence standard to make that determination. And if they find that we're wrong, we lose. Can the defendants do discovery of the class members to identify those people that Judge Dyke was asking you about and then present that evidence at trial to show that those are precisely the type of people whom if they had sued AstraZeneca in their own right, they would have necessarily lost? They haven't tried to do that. Discovery's closed. We're going to trial in October. And they put on no evidence. Let me just ask a different question, which may help to shed some light on this. As I understand it, and correct me if I'm mistaken, there is a generic entry now. No, there is not. There's not. Still not. Still not. And when will there be generic entry? It's anybody's guess right now. And Nexium is no longer prescription. It's over the counter. Yes, it is. It is a prescription drug. They're advertising like crazy. But it also is being sold by Pfizer over the counter. So it's both. But it's a different market. That gets into a different issue. People who buy over the counter who go to a drugstore, that's a different group of people who go to the doctor and get a prescription. Okay. Thank you. Thank you. We have four minutes. Thank you, Judge Ferro. I had just three quick points on rebuttal. First of all, Judge Dyke, I never answered the portion of your question about Halliburton. So if I may, let me just briefly address Halliburton and explain why, contrary to plaintiff's suggestion, we don't think that Halliburton somehow sub silentio overruled new motor vehicles and Walmart. Halliburton is critically different because of the presumption of reliance, the fraud on the market presumption. And the way in which that presumption operates is that if all of the predicates for the presumption are established, and in particular the predicate that there is an efficient market, reliance is treated as a common issue for class certification purposes. That is the legal fiction that underlay the Supreme Court's decision in Basic v. Levinson. And so while it is true of the Halliburton class who were injured because they didn't rely, the court indicated that the presumption can be rebutted. But what the court was saying, I think, is that the presumption can be rebutted at trial. The legal fiction of Basic is that once the premises for the fraud on the market presumption are established, reliance is a common issue for class certification purposes, and there is no ability to rebut that at the class certification stage. And, indeed, Justice Thomas, in his dissenting opinion, identifies that as one of, in his views, the principal flaws with the Basic presumption. Obviously, no such presumption is applicable here. And so Halliburton, I think, stands on a very distinctive footing. In securities cases, defendants lack the ability to rebut the presumption with regard to the lack of individualized reliance, even if they can now rebut it with evidence of the absence of a price impact. Well, but Halliburton does seem to say that it contemplates the possibility that you could have a class action in which, where you have this presumption, you could nevertheless have a few class members, the occasional class member whom the defendant could pick off at trial, as I understand it. It doesn't address the question of whether, in a particular case, that pickoff process would be sufficiently manageable to certify a class action. Well, I think that that's fair, Judge Gatta, but I think my point is simply that the Court was talking about, again, the ability to rebut the presumption at trial. And so to get back to your hypothetical from my opening argument, I think this case stands on a precisely different footing, because the plaintiffs have identified no such mechanism that they will be able to use. And I think that that was very clear in your colloquy with my friend, Mr. Wexler, and that really brings me to my second point. Before you get to the second point, so what you're saying is that in Halliburton, there were some class members who weren't injured because they didn't rely. They couldn't have been injured because they didn't rely, but there has to be a mechanism for picking them off at trial. No, I think the Court was speaking generally about the presumption, not about the specific facts of Halliburton. And I think that all the Court was saying is that the mere fact that the defendants may have the ability to do that at trial doesn't in any way affect the applicability of the presumption at the class certification stage. And, again, to the extent that this is not clear from the relatively limited discussion, in the majority opinion, I think it is clear from Justice Thomas' dissent, which, again, I think identifies this as, in his view, one of the critical flaws of Halliburton. I do want to get to this point about plaintiff's model, because I think it really does underscore the fundamental flaw with this whole enterprise. Dr. Rosenthal, plaintiff's expert, repeatedly in her deposition, admitted that she conducted her analysis only on an aggregate level and that her model would not permit any sort of identification of those class members who have been injured and those who have not. And I would point the Court to pages 371 to 372. She is not including damages for the uninjured class members. Well, that is true, and we're not disputing that. But our point here goes to fact of injury, not amount of damages. And, again, I would urge this Court to look at 371 to 372, 375, 401, 411, and 465 to 466. And in her rebuttal declaration at 204, she says, and I'm quoting, there is simply no utility in identifying, on an individual basis, members of a subsection of the class with zero damages. By her own concession, her model did not do that. So are you saying her aggregate model will not include, notionally, damages suffered by people who didn't suffer any damages, but that it has no mechanism for identifying who those people are when it comes to disability? That is correct. We are not suggesting that the model would somehow award damages to those people. We're suggesting that the model does not allow identification of those people. And I would just say, with the Court's leave, one very quick last point. You might very well be wondering why the plaintiffs didn't make an effort to narrow the class in this case to eliminate all these categories of uninjured class members. I would respectfully submit that the answer to that question is quite simple. Either plaintiffs would have to define an impermissible fail-safe class by defining the class in terms of plaintiffs who have suffered no injury, and as Judge Young correctly recognized, that would be impermissible. Or plaintiffs would have to define the class in a way where the class members could not be ascertainable for this precise reason. If they were to exclude, for instance, brand loyal consumers, it would be impossible to identify those individuals without conducting an individualized inquiry at the threshold to determine who is in the class. Could you have smaller classes? You know, it's all participants in the Walmart health plan during so-and-so and so-and-so. So we know exactly what the terms are of the contract. We have all the transactions. Plaintiffs have made no effort to offer any such classes. I think it would be very difficult for them to do so, even with regard to consumers for this brand loyal problem. And that simply underscores the fact that there are simply some cases that are not suitable for class certification, precisely because it is impossible for plaintiffs to show that common issues predominate over individualized ones. We respectfully submit that this is such a case, and therefore that the class certification orders should be reversed. Thank you.